## State of Iowa v. James O'Callaghan, Appellant.

**Criminal law:** EVIDENCE OF ACCOMPLICE: CORROBORATION. The uncorroborated testimony of a confessed accomplice is not sufficient to convict one of a crime; and the corroborating evidence must connect defendant with the offense, and be independent of the mere showing of its commission or the circumstances thereof. It is not necessary, however, that the accomplice be corroborated in every material fact; it is sufficient if some of the material facts are so corroborated that the jury is satisfied with their truth, and are thus induced to believe that his entire testimony is true, though not otherwise corroborated. The accomplice in this case is corroborated by sufficient evidence to connect defendant with the offense and to sustain conviction.

**Same:** ADMISSION OF EVIDENCE: PREJUDICE. On a prosecution for breaking and entering in which defendant testified that he had no talk with an accomplice about meeting any person prior to the burglary, and that he did not agree to meet any one afterwards, and that the accomplice had not told him that he agreed to meet any one at a specified place, defendant was not prejudiced by refusal to permit him to state whether he had arranged to meet the other parties to the crime at any particular place, or if he had so agreed to state the place.

**Same:** ADMISSION OF EVIDENCE: PREJUDICE. Where a confessed accomplice testified that he had not been promised immunity because of his attitude in the matter, but that he hoped to get off easier, refusal to permit his cross-examination as to whether he had ever been tried on the charge against him, or had pleaded guilty or not guilty, was not prejudicial to defendant.

**Same.** Refusal to permit the cross-examination of an accomplice as to the business of his wife before he married her, and concerning their prior relations, was proper.

**Same.** Where the defendant was permitted to deny any inference to be drawn from the evidence of the state that he unlocked the windows of the building burglarized prior to the burglary, he was not prejudiced by a refusal to permit him to state whether he was in the basement of the building where the window was opened and who was with him.

**Same:** EVIDENCE OF GOOD CHARACTER: INSTRUCTION. Where the state relied almost wholly upon circumstantial evidence, an instruction that the previous good character of defendant could be considered for the purpose of rebutting the presumption of guilt arising from such testimony, and that it should be considered in its bearing upon the whole case, regardless of the conclusive or inconclusive character of the testimony, and given such weight as the jury thought it entitled to, was proper, and not subject to the objection that it told the jury it could only be considered where circumstantial evidence was relied upon.

**Same:** FLIGHT AS INDICATIVE OF GUILT: INSTRUCTION. Where the court told the jury that if they found the crime was committed as charged, and that if the defendant knew or had reason to know that the persons from whom he ran, if he did run, were officers, and that if he ran away from them or attempted to escape arrest, then they could consider such flight as a circumstance *prima facie* indicative of guilt, to be considered with all the evidence in determining the guilt or innocence of defendant, was not erroneous as charging that flight is *prima facie* indicative of guilt.

**Same:** BURGLARY: EVIDENCE: SUFFICIENCY. The evidence in this case is held to justify conviction for aiding and abetting the commission of the crime of burglary.

*Appeal from Polk District Court.—*Hon. Chas. S. Bradshaw, Judge.

Tuesday, November 12, 1912.

Defendant, with three others, was indicted for the crime of breaking and entering the Polk county courthouse. He was separately tried, found guilty of the offense charged, and sentenced to the penitentiary for the term of ten years. From the judgment imposed, he appeals.—*Affirmed.*

*Sullivan & Sullivan* and *Parsons & Mills,* for appellant.

*George Cosson,* Attorney-General, and *John Fletcher,* Assistant Attorney-General, for the State.

DEEMER, J.—Some time after midnight of March 31, 1911, two men, known as Tom Hatch and Peter Juhl, who were jointly indicted with defendant, entered the Polk county courthouse through a basement window, went into the office of the county treasurer, and, finding an employee there asleep, they turned him over on his face, tied his hands behind his back, bound his feet together, and left him; one of the men saying, "You need not be alarmed, we are going to have some celebrating, probably a good deal of noise, and if you keep still you will not be hurt. I am a bad man, and a man of my word." The two then went into the main room of the treasurer's office where the door of the vault was located and tried to blow open the safe. Their efforts were unsuccessful, but the explosion was so loud that they thought it advisable to leave the building, which they did, retiring through the window by which they had entered. One J. A. Rhodes was also indicted with the defendant, and the four men, defendant, Hatch, Juhl, and Rhodes, were discovered by some policeman near what is known as Fourth and Chestnut streets shortly after the crime was committed, who attempted to arrest them. Hatch and Juhl escaped and have never been apprehended, but Rhodes was taken into custody, and O'Callaghan temporarily escaped, but was subsequently arrested. The claim made for the state is that all were engaged in committing the offense—Hatch and Juhl as principals, and Rhodes and O'Callaghan as accessories—and the principal question in the case is the sufficiency of the testimony to connect O'Callaghan with the crime. If the witness Rhodes is to be believed, there can be no doubt of defendant's guilt; but he is a confessed accomplice, and his testimony is not sufficient unless it be corroborated by other testimony tending to connect the defendant with the commission of the offense. Such corroboration is not sufficient, however, if it merely shows the commission of the offense or the circumstances thereof.

<div style="margin-left:2em">1. CRIMINAL LAW: evidence of accomplice: corroboration.</div>

Code, section 5489; *State v. Smith,* 102 Iowa, 656. But it is not necessary that the accomplice be corroborated upon every material fact to which he testifies. It is enough if he be so corroborated on some of the material facts as to satisfy the jury that he spoke the truth with reference thereto, and thus induced the belief that his entire testimony is true, although not otherwise corroborated. *State v. Feuerhaken,* 96 Iowa, 299; *State v. Hall,* 97 Iowa, 400; *State v. Allen,* 57 Iowa, 431; *State v. Hennessy,* 55 Iowa, 299.

Defendant had been employed in the county treasurer's office for about a month just preceding the burglary, and Rhodes testified that he made the arrangements with O'Callaghan to have a part in the commission of the crime and brought about a meeting between him (defendant) and Hatch about ten days prior to the time the offense was committed. O'Callaghan was advised by Rhodes that Hatch had been implicated in a safe blowing at Foster's Opera House, and according to Rhodes defendant said that he knew where there was a good one, and that "it would take three overcoats to carry it away." Rhodes also testified that defendant met Hatch on Wednesday or Thursday night before the burglary at the corner of Fifth and Grand avenues, where they talked together for ten or fifteen minutes. On the evening just preceding the burglary, defendant and Rhodes were together in the vicinity of the courthouse and visited a number of saloons where they drank together. Later they went to the federal building, which is just east of the courthouse, and there met Hatch and Juhl. Defendant said that he would go over to the courthouse and see if the window was right, left the group for a few minutes, and upon his return said that it was all right, that he had raised it up an inch. He had told Rhodes before meeting the other parties that he had fixed the window so that it could be opened from the outside, and either he or Rhodes had communicated this information to the other parties. Dis-

covering a light in the treasurer's office, O'Callaghan said to his companions that sometimes some of the employees worked rather late. As they stood there the light went out and then on again, and defendant and Hatch walked around to the southwest corner of the building to see if there were any lights in the south or west part of the structure, and Juhl and Rhodes went to the northeast corner to see if they could discover any lights. Having made their observations, the parties all returned to the government building. The light was still burning in the treasurer's office, and. it is claimed that defendant went into a hotel just north of the government building and telephoned to the treasurer's office to see if any one was there. After this the four went to the southwest corner of the courthouse, and defendant and Hatch made another trip around the building for the purpose of discovering if there were any more lights or other evidence of the presence of persons in the building. After their return they joined their companions, and about this time the light in the treasurer's office went out. At O'Callaghan's suggestion Rhodes then went to a point north and west of the building to see if any one came out at either the north or west door. When he returned he found the other three men in front of the entrance to the Union Station south of the courthouse. Hatch then said that he had seen some one in the building, and O'Callaghan remarked, "There was some hoosier by the name of Keller who sometimes slept there and that he would probably be asleep in a few minutes." All the parties then went to the east end of the Union Station, and there defendant and Rhodes stayed while Hatch and Juhl went to a basement window just south of the east entrance to the courthouse which they raised, and thus gained entrance to the building. Defendant and Rhodes watched their codefendants until they disappeared into the building, and, after some parleying as to where they should go, it was finally agreed that they should go to a nearby poolroom, which they did, there meeting

some acquaintances of Rhodes, and the four there had a drink. From there this newly formed party went back to the Union Depot, and were there informed that some one had blowed a safe in the courthouse. Almost immediately they saw Hatch and Juhl coming down the street near the depot; one of them carrying a suit case. Defendant and his companion then turned west on Cherry street, the first street west of the courthouse, and went west to Eighth, thence north to Locust or Walnut street, and thence east again to the Kirkwood Pharmacy, Floyd Coon's Drug Store, and the Chicago Grill, respectively, where they tried to get liquor. From the place last named they went up Fourth street to its junction with Chestnut, at which place it is claimed by previous arrangement they were to meet Hatch and Juhl. At any rate, they here met the last-named persons, each of whom then had a suit case, and discovered upon inquiry from them that the enterprise had been unsuccessful. The four remained here fifteen or twenty minutes, when some policemen appeared. Hatch and Juhl immediately stepped into an alley. Here some shots were exchanged between them and the police. O'Callaghan started to run west to Fifth street, and, reaching that street, he turned north and ran in that direction. Rhodes was taken into custody, and O'Callaghan next appeared at what was known as Clark's Hotel, east of Third street, where he slept the remainder of the night. At that time he was rooming at a house on University avenue, but he did not attempt to return to his room.

This in substance is the testimony of Rhodes, together with some of the undisputed facts disclosed by the record. The testimony offered in support of Rhodes corroborates him with reference to his being with defendant and the other parties to the charge at every point save as to telephoning the treasurer's office from the hotel, and as to defendant's going over to the courthouse to see about the condition of the window. Defendant was a witness on his

own behalf, and he does not deny his association with all of these men and his meeting with them, not only about and near the courthouse on the evening in question, prior to the commission of the offense, but also at the places named by Rhodes after the crime was committed. Indeed, he admits that he was with these men at the places named. He also admits that he had a conference with Hatch at the corner of Fifth and Grand avenues before the parties met, on the evening the crime was committed, at the government building. These facts alone, either admitted by the defendant or proved by independent testimony, were sufficient to justify a finding by the jury that Rhodes told the truth and that defendant in fact aided and abetted the commission of the offense.

II.   Some rulings on the admission and rejection of testimony are complained of. Rhodes testified that it was agreed that he and defendant should meet Hatch and Juhl after the crime was committed on Chestnut street. Defendant, as a witness on his own behalf, was asked as to whether he had any agreement to meet these parties in front of the Grant club, or to meet anybody at that point, or, if he was to meet them, where the place was. Objections to such questions were sustained, and of this complaint is made. These rulings could not be sustained save for the fact that the witness was permitted to testify directly to the fact that he had no talk with Rhodes prior to the burglary about meeting any one, and further testified, without objection, that he had no agreement to meet anybody after the burglary was committed, and that Rhodes did not indicate to him that he had an agreement to meet anybody at Fourth and Chestnut, or on Chestnut. The rulings were without prejudice.

On cross-examination Rhodes was asked as to whether he had ever been tried on the charge against him, and as to whether he had pleaded guilty or not guilty. It was sufficiently shown that Rhodes was an accomplice, and the

*2. SAME: admission of evidence: prejudice.*

nature of his plea, or whether he had been tried or not,
was material only to show that, because of
his connection with the matter, he was
unworthy of belief, or that, by reason of
testifying against defendant, he had been promised, or was
expecting, some kind of immunity. As to the first point
Rhodes admitted his guilt, and as to the second he subse-
quently testified that he had not been promised any immun-
ity, but that he hoped to get off easier because of his atti-
tude in the matter. This was all that defendant was en-
titled to.

*3. SAME: admission of evidence: prejudice.*

Defendant also propounded questions to Rhodes about
his wife's business before he married her, and as to their
relations before that time, but objections thereto were sus-
tained. There was no error here. We must
assume that, no matter what the facts, the
woman reformed upon her marriage to Rhodes. A part of
an answer given by defendant to a question propounded to
him was stricken as a conclusion. The ruling was correct.

*4. SAME.*

The following record discloses the next objection: "I
was not down in the basement beneath the treasurer's office
March 31, 1911. Q. Were you ever down in that place?
A. Yes, sir. Q. At any time and with whom?
(Objected to as incompetent, irrelevant, and
immaterial, leading and suggestive. Objection sustained,
and defendant excepts.) Q. Will you now state to the jury
whether or not, in the afternoon or on the day of March
31, 1911, you unlocked any of the windows in the base-
ment of the treasurer's office in the Polk county courthouse?
A. I did not. I never told Rhodes that I had unlocked
any windows or would unlock any windows. I never told
Rhodes whether myself or the little fellows were down to
see whether the windows were unlocked. Q. Were they
down there at all? A. I did not know them. I never told
Rhodes they were down there. I had no knowledge on the
night or evening of March 31, 1911, or at any time prior

*5. SAME.*

thereto, that there was a contemplation of robbing or breaking into the courthouse of Polk county." We see no error here of which defendant may complain. He was permitted to deny any inference that a jury might draw from the testimony introduced by the state. So much for the rulings on testimony.

III. Defendant introduced testimony in support of his good character, and the trial court gave the following instruction with reference thereto: "(15) The defendant has introduced testimony tending to show his previous good character as to the trait involved in the offense charged in the indictment. It is competent for a person, accused of a crime, to prove, as a circumstance in his defense, that his previous character, as to the trait involved in the offense charged, was good. Previous good character is not, of itself, a defense, but it is a circumstance to be considered by the jury in connection with all the other evidence in determining the guilt or innocence of the accused. *It is a circumstance which may be shown for the purpose of rebutting the presumption of guilt arising from circumstantial evidence.* It may be considered as tending to show that a man of such character would not be likely to commit the crime charged. It should be given consideration irrespective of whether other evidence is conclusive or inconclusive, and it is for the jury to determine, under all the facts and circumstances in the case, what weight should be given to such evidence." The sentence which we have italicized is complained of. It will be noticed that the instruction does not say that good character can be considered only where circumstantial evidence is relied upon. If it did, it would be wrong. As the case was bottomed almost wholly on circumstantial evidence, the trial court properly instructed that good character could be shown for the purpose of rebutting the presumption of guilt arising from such testimony. But it also instructed that it should be considered in its bearing upon the whole

6. SAME: evidence of good character: instruction.

case, notwithstanding the conclusive or inconclusive character of the testimony, and given such weight as the jury thought it was entitled to. There was no error here. *State v. Krug,* 136 Iowa, 231.

IV. This instruction was given upon the matter of flight or effort to escape: "(14) Evidence has been introduced tending to show an attempt, on the part of the defendant, to escape from the officers of the law. If you find from the evidence, beyond a reasonable doubt, that the offense of breaking and entering was committed, at the time and place substantially as charged in the indictment, and further that the defendant knew, or had reasons to know, that the persons from whom he ran, if he did so run, were officers of the law, and further that the defendant ran away from or attempted to escape arrest, then you are justified in considering such flight as a curcumstance which, *prima facie,* is indicative of guilt, to be considered by you in connection with all the evidence, to aid you in determining the guilt or innocence of the accused. If, upon all the evidence, you entertain a reasonable doubt of defendant's guilt, you should acquit him." This is challenged because of the use of the words, "which *prima facie* is indicative of guilt;" and *State v. Poe,* 123 Iowa, 118, is relied upon. The instruction there considered is not like the one here given. The case is ruled by: *State v. Richards,* 126 Iowa, 497; *State v. Kimes,* 152 Iowa, 240; *State v. Seymour,* 94 Iowa, 699. The authorities last cited sustain the instruction given. The instruction upon the necessity of testimony corroborating Rhodes is complained of, not because it is incorrect, but because it did not go farther and state what would be corroborating testimony. The complaint is without merit. It is sufficient to say that the instructions given sufficiently covered the matter.

V. The verdict has sufficient support in the testimony, and a jury was fully warranted in finding that de-

7. SAME: flight as indicative of guilt: instruction.

fendant aided and abetted in the commission of the offense.

8. SAME:
burglary:
evidence:
sufficiency.

The case is much stronger than *State v. Arthur,* 129 Iowa, 235. Indeed, it is well to note in this connection that Arthur, defendant in that case, was finally convicted. See *State v. Arthur,* 135 Iowa, 48. There was sufficient proof of a conspiracy to make the acts and declarations of one binding on all.

We have gone over the record with great care and discover no prejudicial error.

The judgment must therefore be, and it is,—*Affirmed.*