STATE OF IOWA, Appellee, v. TONY THOMPSON, Appellant.

No. 42891.

Edward L. O'Connor, Attorney General, Walter F. Maley, First Asst. Attorney General, D. N. Johnson, County attorney, and E. R. Hicklin, Special Prosecutor, for appellee.

James E. Reaney and James W. Fay, for appellant.

PARSONS, C. J.—On April 10, 1934, the grand jury of Louisa County, Iowa, returned to the court an indictment charging Tony Thompson, Edward Tallent and Paul Hake with the murder of Martin Wolz by shooting him with a revolver or shotgun. This appeal concerns one of the defendants, Tony Thompson, who is appellant herein, and to this indictment he pleaded "Not Guilty". He was subsequently tried in the district court of Louisa County, Iowa, and the jury returned a verdict finding him guilty of murder in the first degree, and fixed the penalty at death. Exceptions to instructions were filed, motion for new trial was filed, and each was overruled. On the 29th of September, 1934, the defendant was sentenced to death by hanging. From this sentence the defendant appealed to this court, which appeal came originally on transcript filed December 8, 1934. Subsequently he was represented by other attorneys, and they secured an order to extend the time for filing abstract to September term, 1935. Time was again extended to December 15, 1935; and again to January 15, 1936; abstract was filed January 13, 1936, and the matter was finally set for submission at the October 1936 period of this court. All of these delays were at the instance of the defendant. Thompson's attorneys then filed what they denominated as "Abstract of Record" of the case, which was typewritten. Following the filing of this abstract the State filed what it denominated as "Appellee's Denial of, Amendment to and Substitution of Abstract of Record", in which it denied that the abstract filed herein by appellant is a

full, true and correct abstract of the record necessary for the proper determination of the cause, and alleged that there were so many omissions of material evidence and errors in said abstract as to make the following amendment to and substitution of the abstract of record necessary. No denial of this amended and substituted abstract by the State was filed. There were no arguments filed by either the appellant or by the State; and no assignment of error was made.

We have carefully examined the full proceedings and find that upon the record we would be justified in affirming the case for the reason that no proper appeal has been perfected; no proper steps to bring any claimed errors to the court where adjudication had been taken, and such an examination of the record made it necessary to affirm the case. But we have, in view of the fact that this is a case in which the highest penalty known to our law has been ordered inflicted, carefully examined the record as disclosed by all of the papers on file, and in the examination of this record we find that it shows the following set of facts:

Martin Wolz was a bachelor farmer living on a small farm in Louisa County, Iowa, with a housekeeper, Susan Holcroft, a woman sixty years of age. On the night of July 22, 1933, Martin Wolz went in his automobile to the town of Oakville, not far from the farm, taking with him Mrs. Holcroft, his housekeeper, and one Jim Diltz, a close neighbor who lived just a few rods across a forty acres from Wolz. Their object in going to Oakville was to collect some money for hogs Wolz and Diltz had shipped through some association. A Mr. Howard Smith was the manager of the association. There Wolz got $373 and Diltz got eleven dollars and a few cents. The parties left the Diltz place about eight o'clock in the evening, going through Toolsboro to Oakville, where they went to the bank and collected their money. The office of the shipping association was in this old bank, on the west side of the main street of the town. Smith was in the bank, and could be seen across the street through a big glass window in the bank building. The money was paid to Wolz in currency, which he put in his pocketbook, and then into his pocket. Diltz and Wolz went around the street for awhile trying to get a twenty dollar bill changed. It was about 10:30 when they started for home. From Mrs. Holcroft's testimony it appears that Wolz lived about eight miles from Wapello,

southeast, and about a mile and a half from Toolsboro, and the place was back off the road. She also testified to going to Oakville with Wolz and Diltz to get the money, and that it was growing dark when they started to town. That on the way home they went to Toolsboro and got the mail, then went to Wapello and left a can of cream, and were not there very long. She testified that when they got back to the entrance of the lane leading to Martin Wolz place, Mr. Diltz said the gate was ajar; it had been fastened with a chain. When they got down to the Diltz place Mrs. Diltz said a car had gone down the lane; Wolz drove on home and when they got there they found the other gate wide open, the gate that leads into the barnyard at Wolz's place. Mrs. Holcroft testified that she had closed the gate when they left for town, and she closed it when they returned and found it open. Then they saw a car by the watering tank close to the house. That as they followed the lane around the house this other car whirled around and went down the road Wolz had come up, across the culvert. She said she could not tell who was in the car, nor how many. That Wolz put the car in the garage and they went to the house. Wolz unlocked the door and went in, she following him; she lit the oil lamp, while Wolz went to the closet to get his flashlight and went out on the porch to look around; then he came back and again went to the closet, and turned around and said, "My rifle and shotgun are both gone." She said she knew Wolz kept the guns there. Wolz then went to the door which was ajar, and as he opened it Mrs. Holcroft said she heard someone say, "Stick them up", and she looked toward the door and a man stood there with a shotgun, and he stepped back and she believed he shot through the window. Wolz reeled and fell backwards onto the kitchen floor, then two men came in; that one worked over Martin and the other one pushed Mrs. Holcroft into a chair and told her to keep quiet, ordering her not to give any alarm, saying the house was guarded. She testified that this man put his hands over her eyes, and said, "we may have to kill you." Then he took his hands from her eyes and pointed to the other place and said, "That house is guarded too." "These backwoods farmers have got money and we are going to have it." Then the man pushed Mrs. Holcroft out of the chair, tied her hands with some rope and her feet with a towel, and she went down in a slump on the floor. The man going through Mr. Wolz's pockets asked Wolz

where his money was and Wolz said he didn't have any; then the man turned to Mrs. Holcroft and asked her where it was, and she replied she didn't know, and added. that she did not think he had a great lot; that he had lost it in four banks and he owed her pretty near a year's work. She said she then heard the man who was going through Mr. Wolz's pockets say something about five dollars, and she heard him say, "Damn him, I know he has got more than that." She says the man was bending over Wolz, going through his pockets. And she further testified that she had identified the man, and pointing to the defendant Tony Thompson, she said, "That is him right there." Mrs. Holcroft testified that she had never seen Tony Thompson before that time; that she noticed he was very slender; and she particularly remembered that he almost fell down when he was working on Wolz; that he slipped, she didn't know whether it was blood or whether he was intoxicated, but the man who worked on her had liquor on his breath. She also identified the man who said, "Damn him, I know that he has got more than that", as Tony Thompson; but she didn't see whether he had five dollars in his hand as he was searching Wolz's pockets at the time.

Paul Hake, jointly indicted with the appellant herein, was used as a witness by the State. The defendant's attorneys seem to labor under the delusion that Hake was not a competent witness because he had been indicted; but the court rightly permitted him to testify. He said he was 23 years of age; that he had resided in Louisa County for about six years; that he lived in St. Louis in 1933, and worked at the Gold Dust Corporation, in the shipping department there and knew Tony Thompson, who was foreman of the shipping department; he also said he knew Tallent, and that he worked in the department too. Paul Hake testified that the 22nd of July, 1933, was Saturday; that he and Eddie Tallent and Tony Thompson worked until noon of that day; that in the afternoon they came to Iowa in Tony's car, a Chevrolet. He testified that they first came to Burlington, then stopped at Oakville somewhere around nine o'clock; that he and Tallent got out of the car, but Tony did not get out; that they were drinking on the way up, starting in St. Louis; that they got some liquor at Oakville at a place on the outer edge of town; then they went to Eli Harvey's, who lived under the hill from Toolsboro, about a mile; that the three were in the car

when they went to Harvey's, the witness driving. He stated that Tony got out of the car and went to Harvey's car; that Harvey came to their car and rode on the running board as far as the gate. Hake testified that he talked with Harvey, asked him who was working for Martin Wolz; that Harvey answered, but the witness stated he was so drunk he did not know just what was said there. He remembered hearing someone say, "If anybody asks you, tell them it was Brown", but he did not know who said it. The witness testified that he had worked at Martin Wolz's place at one time; that he and Tallent and Tony Thompson drove inside the gate at the Wolz place, Tony Thompson and Tallent got off at the house, and the witness (Paul Hake) drove back down a little ways; that when Wolz and Mrs. Holcroft went to the house, he (witness) went over into the cornfield, and was not at the house at any time; that he heard shots, and in about five minutes Tony Thompson and Eddie Tallent came over to the car and said they had killed that old man. Hake testified further that before they left St. Louis they talked about what they were going to Iowa for, to rob Martin Wolz. He testified that when Tony and Eddie came back to the car they had guns in their arms; that he did not see any gun on the way up, and the men did not have guns with them when they went to the Wolz house. He testified that they put the gun in the car somewhere, he did not know where, when they got in for the return trip; that they went back to St. Louis that night, and arrived home about ten o'clock the next morning.

On cross examination Paul Hake testified that he had known Tony Thompson all his life. He further testified that they were all pretty well intoxicated when they got to Oakville, and the witness was still buying liquor. He said they went from Oakville to Harvey's place, didn't know they were having a party there that night; they got a drink there, and then went to the Wolz place. He said he was in the cornfield when Wolz and Mrs. Holcroft came along. He said he did not remember saying in Oakville, when asked if he had cold feet, "I have come this far and I am going to go through with it."

Mr. Huddleston, called on the part of the State, said he was at Harvey's when a car stopped there, and he recognized the man he talked with as Tony Thompson, and when he asked Mr. Harvey who he was Harvey told him a man by the name of

Brown of Burlington, and Huddleston said, "if that isn't Tony Thompson I am fooled" or something to that effect.

William Stigge, a witness for the State, who lived in that neighborhood of Oakville at the time, testified he was at Oakville on the night of July 22, 1933, and stayed close to ten o'clock. That he saw Tony Thompson in Oakville that night; that the first time he saw him across the street from the post-office; that he saw him and another man acting very suspiciously. They were looking and watching across the street at the bank where Mr. Smith was handling a lot of money. He testified that he watched three or four minutes, when a third man came staggering over and spoke to him and said, "Hello". Then the man asked Hake, "How about it, have you got cold feet already?" and Hake said, "Cold feet? No, I got this far and I am going the rest of the way with you." And then Tony Thompson said, "Drive on," and they catacornered across the street, and that was the last he saw them, until he saw Tony in St. Louis and the other two in Muscatine jail.

Eli Harvey testified that when Tony Thompson came to his place he told Harvey that if anybody asked who it was to tell them it was a man by the name of Brown who wanted to sell him some whiskey, and he said he told him to be "damn sure you don't tell them anything else", and to keep that under his hat or they would get him and his family. He testified that while he was there Paul Hake said something about Huddleston knowing Tony, but he said it when the third man was not there. The witness Harvey was asked,

"Q. You asked if the third man wasn't Tony Thompson? A. Not until his name was called. Paul Hake said it was."

He further testified that Paul Hake asked if there was any one working for Martin Wolz, and the witness said there was but he did not know who it was. Harvey said he had two drinks of whiskey while he was there; that they had a pint.

There was considerable more testimony along this line. They called physicians who testified as to the injuries received by Wolz, and from their testimony it was disclosed there must have been at least two shots fired, altho Mrs. Holcroft testified she heard but one; that they must have been fired at the same time. They testified that there was a shotgun wound in the head, and a bullet wound, each of which the physicians testified

was sufficient to cause death. That the shotgun wound was in the face, a portion of which was torn entirely away, a portion of the jaw was left on the side of the face, a portion shot away, the nose was gouged out from underneath, so that the nose was just a small shell, and other lacerations; that they also found a gunshot wound in the abdomen that had punctured just to the right and almost at McBernie's point; that this was caused by a bullet from a gun. They testified there was a facial wound caused by some sharp instrument.

The defense consisted of the denial by Tony Thompson of everything anybody said against him, and an attempt to prove an alibi, with his wife; his daughter, about thirteen years of age; his sister, Mrs. Rexford Hake; his sister-in-law, Mrs. Mary Roadifer; his mother-in-law, Rose Skaggs; Rexford Hake, his brother-in-law; and Ralph Roadifer, a brother-in-law.

We have gone carefully over the instructions; we see no error in them. We think these facts fully warranted the jury in finding the defendant guilty, and in inflicting the highest punishment known to the law. These men went out to the place of the deceased in the nighttime for the purpose of robbing him; they all had been drinking heavily; they left St. Louis with this plan in mind. Paul Hake, who had worked for Wolz, hid in the cornfield, so he might not be seen and recognized. They visited the house before Wolz got home, and took his guns, a rifle and a shotgun. Hake had worked there and knew the lay of the place. Their brutality in this matter was excessive. They planned this crime. Of course nothing was shown that they knew of the previous shipment of hogs by Wolz, but they happened at Oakville just the night the old gentleman was settling for his hog shipment. They stood across the street from the bank building, where they could watch what was going on, when Smith was distributing the money. They went up with no firearms; but firearms disappeared from the Wolz place that night. The testimony of the old housekeeper, alone, was sufficient to convict Tony Thompson, let alone the testimony of Paul Hake. True, Paul Hake was an accomplice. Section 13901 of the code provides:

"A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and

the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

The defense seems to have some glimmer of an idea that because Paul Hake was an accomplice his testimony would not sustain the conviction. An analysis of the section just quoted leaves the jury free to convict the defendant upon the testimony of an accomplice if it is corroborated by other evidence which would tend to connect it with the commission of the offense. If there is in the books more corroboration, better corroboration, than is to be found in this case, we have been unable to discover it. The appellant lived in St. Louis. He drove clear up to Louisa County for some purpose; he was seen there by different people; recognized by the housekeeper at the Wolz place, present when the shot was fired, present when the old man lay on the floor with Tony going through his pockets. If that isn't corroboration tending to connect the defendant with the commission of the offense, it is difficult to say what is corroboration.

The above statute has often been before this court for construction, and this court has held that the evidence must connect the defendant with the crime, other than that which is furnished by the accomplice, and must tend to connect the accused with the commission of the offense. And we have held that the corroboration was sufficient where there was much less testimony than there is here. State v. Thornton, 26 Iowa 79; State v. Wart, 51 Iowa 587, 2 N. W. 405; State v. Dietz, 67 Iowa 220, 25 N. W. 141; State v. Burch, 199 Iowa 221, 200 N. W. 442.

When the testimony of an accomplice is corroborated by other witnesses in any material point tending to connect defendant with the commission of the offense, it is sufficient. State v. Schlagel, 19 Iowa 169; State v. Hall, 97 Iowa 400, 66 N. W. 725; State .v. O'Callaghan, 157 Iowa 545, 138 N. W. 402; State v. Christie, 193 Iowa 482, 187 N. W. 15; State v. Stader, 194 Iowa 1087, 190 N. W. 373; State v. Lozier, 200 Iowa 652, 204 N. W. 256.

Therefore, we find no error in the record, of any kind; we find on the other hand that the record shows that the appellant knowingly entered into an arrangement to rob an old man; to steal what money he had accumulated; that they filled their systems full of liquor, and that Tony Thompson committed this murder. It would be a failure of justice if the jury found other

than it did find, and the law grants the power to fix the punishment. The district court judge has approved this and entered sentence, and it is not up to us to change it. Therefore, for the reasons pointed out, the decision below is affirmed.—Affirmed.

ALBERT, ANDERSON, STIGER, KINTZINGER, HAMILTON, DONEGAN, and RICHARDS, JJ., concur.