# IN THE COURT OF APPEALS OF IOWA

No. 17-0592
Filed June 20, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CHRISTOPHER YENGER,**
        Defendant-Appellant.
_____


Appeal from the Iowa District Court for Wapello County, Joel D. Yates, Judge.


Christopher Yenger appeals his convictions for two counts of first-degree murder following a jury trial. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


Heard by Vaitheswaran, P.J., and Doyle and Tabor, JJ.

**VAITHESWARAN, Presiding Judge.**

A fire set in a home north of Ottumwa resulted in the death of two occupants. An investigation turned up no solid leads until a decade later. At that time, the State charged Christopher Yenger with two counts of first-degree murder. A jury found him guilty as charged. On appeal, Yenger contends (1) the State presented insufficient evidence to corroborate accomplice testimony, (2) his trial attorney was ineffective in failing to challenge certain jury instructions, and (3) the district court provided inadequate reasons for denying his post-trial motions.

## I. Corroboration of Accomplice Testimony

Iowa Rule of Criminal Procedure 2.21(3) requires the corroboration of accomplice testimony:

> A conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

The district court designated one man—Zachary Dye—an accomplice as a matter of law. *See State v. Douglas*, 675 N.W.2d 567, 571 (Iowa 2004) ("When the facts and circumstances are undisputed and permit only one inference, whether a witness is an accomplice is a question of law for the court."). The court instructed the jurors they could also find a second man—Kyle Jameson—an accomplice. *See id.* ("In view of the contrary inferences that could be drawn from the evidence, it was for the jury to choose which inferences were warranted under the testimony given at trial."). However, the court did not give the jurors a special interrogatory asking whether they found Jameson to be an accomplice.

Both men testified for the State and implicated Yenger. Yenger moved for judgment of acquittal on the ground the State failed to present sufficient evidence to corroborate their testimony. The court denied the motion.

On appeal, Yenger argues Jameson, too, was an accomplice and, accordingly, his testimony could not be used to corroborate the testimony of Dye. *See id.* at 572 (stating "the testimony of one accomplice may not corroborate the testimony of another accomplice"). The State responds that, even if Jameson was an accomplice, foreclosing reliance on his testimony as corroborative of Dye's testimony, there was ample independent evidence to corroborate both their stories. In addressing this question, we note, "Corroborative evidence need not be strong as long as it can fairly be said that it tends to connect the accused with the commission of the crime and supports the credibility of the accomplice[s]." *State v. Barnes*, 791 N.W.2 817, 824 (Iowa 2010) (quoting *State v. Berney*, 378 N.W.2d 915, 918 (Iowa 1985)).

Dye testified he, Jameson, and Yenger went to a party. Yenger got into a fight, was head-butted by a man, and ended up with a bleeding, swollen nose. The trio was asked to leave the party. On their way to Dye's apartment, Yenger said that "something had to be done." He was "pissed off" and "said he wanted to catch the house on fire." The three decided to return to the party "[t]o set the house on fire." On the way, they stopped at a gas station. Yenger got out and "filled a beer bottle full of gasoline." He "stuffed a paper towel or napkins in the top of the beer bottle" to "mak[e] a Molotov cocktail," which Dye described as "kind of a gas bomb." Dye and Yenger got out of the vehicle. When they got "right in front of the house," Yenger lit the paper towel in the beer bottle and "threw it at the house." Dye heard

"glass breaking" and saw "the house light up" and "flames go up." They "ran as fast as [they] could back to the vehicle." They turned and found "the house was fully in a blaze."

The following morning, the three learned the house burned down and two people died. Dye and Yenger decided to concoct a story that they "went to the party," "[t]here was a fight," they "got back in the car," they "[w]ent to [Dye's] apartment," and they "all passed out." Yenger later told Dye "to stick to the script" and "don't talk about it." After Dye was jailed, he received a note from Yenger stating "we have this thing beat" and "stick to the script."

Jameson similarly testified to their attendance at the party. When they were leaving, he said he heard Yenger "arguing with a guy." Yenger got into the back seat of the car and "was kind of holding . . . his face or his mouth." Yenger said, "[H]e was going to get them back or something." On the way to Dye's apartment, Yenger "said something about going back and setting the house on fire." When they arrived at the apartment, Yenger got out and, "a couple minutes" later, Yenger "showed back up to the vehicle and he had a gas can." The three returned to the party. Yenger got out of the car with the gas can. He went up to the house and tried "to set a tree on fire." Jameson "kept seeing kind of little poofs of fire shoot up and then go back down." He twice saw "a bright ball of fire." Yenger ran back to the car and they took off. The next morning, after learning what happened, Yenger told Jameson "if anyone asked, to tell them we just went out to the party and was drinking and went home and passed out." In an interview, Jameson conveyed the concocted story to law enforcement officers. Later, he "started feeling really bad" and, in a second interview, he told the officers "the whole story."

When he was confronted with pictures of the crime scene and saw that there were no trees next to the house, he told an officer he believed Yenger "poured gas on the house and lit it on fire."

There were certainly discrepancies between Dye's and Jameson's versions of events, not the least of which were the descriptions of the container holding the gas. But both men consistently said Yenger started the fire.

Yenger did not testify at trial. But in pretrial statements to two individuals, he essentially admitted his involvement in the crimes. *See Douglas*, 675 N.W.2d at 572 ("[A] defendant's out-of-court confessions and admissions may corroborate the testimony of an accomplice.").

Acquaintance Jeramia Gillespie testified he asked Yenger if he would "be okay with" engaging in illegal activities. Yenger responded that, about ten years earlier, "he was involved in a house fire that killed two boys." Yenger explained "he and Zach Dye were attending a party and they got into it with the people that were there already." They left, but returned to the party with "like a Molotov cocktail . . . to get back at the people that made them leave." According to Gillespie, Yenger said he "firebombed the place where the party was at."

Yenger also told fellow jailhouse resident Christopher Showalter "he had two bodies and that's what he was there for." He explained he was with Dye and Jameson, and he saw "a flash of light" from the car. Yenger told Showalter, "[T]hey say that he caught a tree on fire, and that it was wet, and that if anything, the house caught the tree on fire." While in jail, Showalter heard Yenger tell Dye, "Keep your head up. Keep your stories straight. We can get through this if our stories match."

According to Showalter, Yenger told another resident, "[Jameson] need not make it to court and that [the other resident] would be taken care of."

Yenger's pretrial statements to Gillespie and Showalter amounted to independent corroborative evidence of the accomplice testimony. But there was more.

Law enforcement officers also interviewed Yenger. Although he stuck with the concocted story and said he "went back to the apartment and passed out" after the party, he admitted going to the party with Dye and Jameson, getting into a fight at the party, getting "beat up," and being "irritated." These admissions corroborated the accomplices' testimony concerning his motive for setting the fire. *See State v. O'Callaghan*, 138 N.W. 402, 405 (1912) (noting defendant did not "deny his association with [the accomplices] . . . on the evening in question, prior to the commission of the offense, but also at the places named by [one of the accomplices] after the crime was committed").

We conclude there was sufficient independent evidence to corroborate the testimony of Dye and Jameson. The district court did not err in denying Yenger's motion for judgment of acquittal.

## II. *Ineffective Assistance*

Yenger claims his trial attorney was ineffective in failing to challenge three jury instructions. To prevail, Yenger must show (1) deficient performance and (2) prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We find the record adequate to address the issue. *See State v. Ross*, 845 N.W.2d 692, 697 (Iowa 2014).

### *A.* ***Accomplice Instruction***

The district court gave the following accomplice instruction:

> An "accomplice" is a person who knowingly and voluntarily cooperates or aids in the commission of a crime.
>
> A person cannot be convicted only by the testimony of an accomplice. The testimony of an accomplice must be corroborated by other evidence tending to connect the defendant with the crime.
>
> You are instructed that the Court has found that Zachary Dye was an accomplice and you must consider him an accomplice and the defendant cannot be convicted only by that testimony. If you find Kyle Jameson is an accomplice, the defendant cannot be convicted only by that testimony. There must be other evidence tending to connect the defendant with the commission of the crime. Such other evidence, if any, is not enough if it just shows a crime was committed. It must be evidence tending to single out the defendant as one of the persons who committed it.

Yenger argues, "Trial counsel should have requested and the district court should have given an instruction informing the jury that [Dye's and Jameson's] testimony could not be used to corroborate each other's testimony." Relatedly, he contends "[t]he jury should have been told there must be independent corroborating evidence connecting [him] to the crime." His claim is premised on the assumption the jury found Jameson to be an accomplice. *See State v. Harris*, 589 N.W.2d 239, 242 (Iowa 1999) ("There is no language in [what is now Iowa Rule of Criminal Procedure 2.22(2)] mandating the submission of interrogatories in all instances in which the conditions described in the rule exist.").[1] Because the district court did not submit a special interrogatory asking the jury to answer this question, we do not know whether the jury found him to be an accomplice. For purposes of this argument, we will assume without deciding Jameson was an accomplice.

---

[1] In *State v. Ellis*, No. 09-1210, 2011 WL 944428, at *6 (Iowa Ct. App. Mar. 21, 2011), this court stated, "[S]pecial interrogatories would have assisted this court in its appellate review."

The instruction adequately conveyed the law that "the testimony of one accomplice may not corroborate the testimony of another accomplice." *See State v. Barnes*, 791 N.W.2d 817, 824 (Iowa 2010) (quoting *State v. Douglas*, 675 N.W.2d 567, 572 (Iowa 2004)). We recognize the uniform language is not designed for more than one accomplice. *See* Iowa State Bar Ass'n, Iowa Crim. Jury Instruction No. 200.4 (2016). But the modified language of this instruction identified Dye as one accomplice and identified Jameson as the other potential accomplice. The instruction also stated Yenger could not "be convicted only by the testimony of an accomplice." It stood to reason that independent corroboration was required for each accomplice. *See State v. Horn*, 282 N.W.2d 717, 731 (Iowa 1979) (finding language "sufficient to advise the jury that evidence of one or more accomplices cannot convict a defendant unless corroborated by other evidence"); *State v. Everett*, 214 N.W.2d 214, 219 (Iowa 1974) (finding district court adequately accommodated the defendant's request to add a statement to an accomplice instruction indicating one accomplice could not corroborate the testimony of another accomplice). As discussed, the record contains independent corroboration of the accomplice testimony. We conclude counsel did not breach an essential duty in failing to challenge the instruction.

### B. Arson Instruction

The first-degree murder charges required the State to prove four elements, including the following: (4) Yenger killed the individuals "while participating in the crime of Arson in the First Degree." Arson was defined for the jury in a separate instruction.

Yenger argues his attorney should have challenged the arson instruction on the ground the jury was not "instructed that the State had to prove each and all elements of Arson in the First Degree in order to find [he] participated in the crime, as required in the fourth element of the offense of Murder in the First Degree."

Yenger is correct that the arson instruction did not require proof of each arson element. But (1) the jury was instructed to "consider all of the instructions together," (2) the first-degree murder instructions informed the jury the State needed to prove "all of the elements," and (3) one of the elements of first-degree murder was the participation in arson as separately defined. It follows that all the elements of arson had to be proved to find the fourth element of first-degree murder satisfied. *See State v. Liggins*, 557 N.W.2d 263, 267 (Iowa 1996) ("When a single instruction is challenged, it will be judged in context with other instructions relating to the criminal charge, not in isolation."). Yenger's attorney did not breach an essential duty in failing to challenge the arson instruction.

### C. Prior Statements of Yenger

The jury was instructed

> Evidence has been offered to show that the defendant made statements at an earlier time and place.
> If you find any of the statements were made, then *you may* consider them as part of the evidence, *just as if they had been made at this trial.*

(Emphasis added). Yenger argues the highlighted language was incorrect. In his view,

> While the rules of evidence provide that statements of party opponents are admissible, the rule of evidence and the rationale underlying the hearsay exception provides no authority to require the jury to consider the statements as bearing the same weight as testimony received at trial, made under oath and under penalty of

perjury. Instead the jury should have been free to assign whatever weight and reliability to the statements as it saw fit.

The challenged language comes from a uniform jury instruction. *See* Iowa State Bar Ass'n, Iowa Crim. Jury Instruction No. 200.44 (2016). "Normally, we are slow to disapprove of the uniform jury instructions." *State v. Ambrose*, 861 N.W.2d 550, 559 (Iowa 2015).

We recently examined the instructional language Yenger challenges. In *State v. Payne*, No. 16-1672, 2018 WL 1182624, at *8 (Iowa Ct. App. Mar. 7, 2018), we stated, "Any relevant statements [the defendant] made out of court that [were] inconsistent with his position at trial were . . . admissible, whether or not he testified." We cited Iowa Rule of Evidence 5.801(d)(2), which, in part, excludes from the definition of hearsay "[a]n opposing party's statement," which "is offered against an opposing party" and "[w]as made by the party in an individual or representative capacity." *Id.* Significantly, the rule does not require the party opponent's prior statement to have been made under oath. *See* Iowa R. Evid. 5.801(d)(2). In contrast, a declarant-witness's prior inconsistent statement must have been "given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." Iowa R. Evid. 5.801(d)(1)(A). In both instances, it is up to the jury to decide what weight to accord those statements.

Although the challenged instructional language does not appear in rule 5.801(d)(2), we believe it is a correct statement of the law. Contrary to Yenger's assertion, the language allows rather than requires the jury to consider the statements "just as if they had been made at this trial." The language is consistent with other instructions, including an instruction authorizing jurors to consider prior

unsworn inconsistent statements to assess witness credibility. The language also is consistent with an instruction on witness credibility, which allows jurors to consider "[w]hether a witness has made inconsistent statements" in deciding what testimony to believe.

Because the challenged language does not require jurors to accord the same weight to an unsworn prior inconsistent statement as they would to trial testimony, we conclude Yenger's attorney breached no essential duty in failing to object to that portion of the instruction. *See Payne*, 2018 WL 1182624, at *9 ("The instruction did not direct the jury to assign the statement any particular weight or unduly emphasize the matter, nor did it create an improper permissive inference or presumption."); *see also State v. Hayes*, No. 17-0563, 2018 WL 2722782, at *5 (Iowa Ct. App. June 6, 2018) (concluding counsel was not ineffective in failing to challenge this instruction); *State v. Wynn*, No. 16-2150, 2018 WL 769272, at *3 (Iowa Ct. App. Feb. 7, 2018) (noting instruction made "no reference to a presumption or an inference")*; State v. Wineinger*, No. 16-1471, 2017 WL 6027727, at *3 (Iowa Ct. App. Nov. 22, 2017) (concluding instruction was "a correct statement of law"); *State v. Tucker*, No. 13-1790, 2015 WL 405970, at *3 (Iowa Ct. App. Jan. 28, 2015) (disagreeing with assertion that the instruction was misleading).

### D. Cumulative Error

Yenger argues "the cumulative effect of multiple errors may amount to ineffective assistance." Having found no individual errors, we decline to find cumulative error.

### III.    Post-Trial Motions

Yenger filed a combined motion in arrest of judgment and motion for new trial.  He asserted the evidence was insufficient "to support the jury verdict in that the witnesses who were relied upon to corroborate the alleged accomplices' testimony were not credible" and the verdict was "contrary to law and evidence."  The State filed a resistance.  At sentencing, the district court summarily denied the motions for "each and every reason set forth in the State's Resistance."  The court also cited the standard set forth in *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998) (adopting weight-of-the-evidence standard for consideration of new trial motions filed under Iowa Rule of Criminal Procedure 2.24(2)(b)(6)).  The State's resistance summarized the evidence on which the State relied, including the testimony of Dye, Jameson, Showalter, and Gillespie.

Yenger argues the court failed "to meaningfully consider his arguments in the post-trial motions."  He notes the absence of any reference to "his argument that Dye and Jameson lacked credibility" or his argument that "there was insufficient corroboration of their testimony."  Yenger acknowledges that, in *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008), the Iowa Supreme Court refused to reverse a summary denial of a new trial motion.  He asks us to overrule *Maxwell*.

In *Maxwell*, the court stated,

> In denying Maxwell's motion, the district court must have found the jury's guilty verdict was not contrary to the weight of the evidence. Because Maxwell's motion raised the issue in the district court, we are allowed to review the record to determine whether a proper basis exists to affirm the district court's denial of Maxwell's motion for new trial.

743 N.W.2d at 193. We are not at liberty to overrule this precedent, as Yenger requests. Having reviewed the trial evidence and the merits of Yenger's motion,[2] we conclude the district court did not abuse its discretion in denying the new trial motion. Assuming Yenger is also challenging the court's denial of his motion in arrest of judgment, we conclude the jury's findings of guilt were supported by substantial evidence.

We affirm Yenger's convictions for two counts of first-degree murder.

**AFFIRMED.**

Doyle, J., concurs; Tabor, J., dissents.

---

[2] We are unpersuaded by the State's error-preservation concern because the issue was raised and decided in the district court.

**TABOR, Judge.** (dissenting)

I respectfully dissent. The court instructed the jurors that if they found Yenger made statements at an earlier time and place they were allowed to consider those out-of-court statements as part of the evidence—"just as if they had been made at this trial." This instruction misstated the law. The majority acknowledges the disputed language cannot be found in the rules of evidence. And contrary to the majority's interpretation, the instruction's use of the term "may" does not mean the jurors were *allowed* but not *required* to give the out-of-court statements the same weight as sworn testimony. Rather, the instruction permitted jurors to decide whether they believed Yenger made the statements attributed to him by accomplices, acquaintances, or jailmates. Once the jurors chose to consider Yenger's out-of-court statements as part of the evidence, the instruction assigned his statements the same status as if he had made them under oath. Because the flawed instruction prejudiced Yenger, I would reverse and remand for a new trial.

Yenger's extrajudicial statements were not hearsay and were admissible because the State offered them against the opposing party. *See* Iowa R. Evid. 5.801(d)(2)(A). Admissions by a party-opponent "constitute substantive evidence of the facts asserted but are not conclusive evidence of those facts." *See State v. Bayles*, 551 N.W.2d 600, 606 (Iowa 1996). Critically, substantive evidence is not the same as sworn testimony. Yenger's admissions were not made under oath and, therefore, did not have the same binding effect on the declarant. Unless admissions are made in open court, they will not warrant a conviction without

sufficient corroboration.[3]  Iowa R. Crim. P. 2.21(4); *State v. Polly*, 657 N.W.2d 462, 466 n.1 (Iowa 2003).  In the absence of the oath, any ability to observe the declarant's demeanor, and cross examination to aid in determining credibility, the probative force of out-of-court statements differs from the probative force of testimony.  It was a mistake to instruct the jury on a false equivalency.

As the majority notes, the disputed language comes from a stock instruction.  Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.44 (2016).  It is true we are "reluctant to disapprove uniform instructions."  *See State v. Weaver,* 405 N.W.2d 852, 855 (Iowa 1987) (citing *State v. Jeffries,* 313 N.W.2d 508, 509 (Iowa 1981)).  But uniform instructions are not "preapproved" by our supreme court.  *See State v. Robinson*, 859 N.W.2d 464, 490 (Iowa 2015) (Wiggins, J., dissenting) (asserting "we can never delegate the formulation of the law to the instruction committee").  In this instance, the bar association's instruction committee did not cite any authority for treating a criminal defendant's unsworn out-of-court statements as the equivalent of in-court testimony offered under oath.[4]

---

[3] As Yenger points out, the uniform instruction on confessions by a defendant does not include a directive for the jury to consider the statements as if they had been made at trial. *See* Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.16 (2016). Rather, the jury is told to consider various circumstances under which the confession was made before deciding how much weight to give it. *Id.*

[4] This uniform instruction previously read: "Evidence has been offered to show the Defendant made statements at an earlier time and place while not under oath. These statements are called admissions. You may consider an admission for any purpose." *See State v. Tejeda*, 677 N.W.2d 744, 754 (Iowa 2004) (finding no prejudice from counsel's failure to object to that instruction where the State did not offer any admissions by Tejeda). In reviewing the same instruction considered in *Tejeda*, one member of our court opined: "This instruction dangerously infers that all statements, offered as uttered by the defendant, implies, or arguably directs, their truth. This impeaches, surely shakes, any contrary exculpatory evidence offered to rebut its content." *Young v. State*, No. 06-0763, 2007 WL 3376830 (Iowa Ct. App. Nov. 15, 2007) (Schechtman, S.J., concurring). It appears the instruction was revised in 2003.

The clear implication of the challenged instruction was that Yenger's extrajudicial admissions were to be given the same force and effect as if he had uttered the words from the witness stand under the penalty of perjury. Because the court instructed the jury with an incorrect statement of law, we presume prejudice, unless the record affirmatively establishes no prejudice resulted. *State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010). Yenger's out-of-court admissions were the meat and potatoes of the State's case; instructing the jury to view them in the same light as sworn testimony could not be considered harmless error.

Further, the flawed jury instruction infringed on Yenger's Fifth Amendment right against self-incrimination. Yenger decided not to testify; the district court instructed the jury not to draw an inference of guilt from that decision. Yet the court also instructed the jury that his earlier statements made outside of court could be considered as if they were his testimony. Other jurisdictions have held the mere fact that admitting statements by a party-opponent may motivate a defendant to take the stand to explain them does not mean he was compelled to do so in a manner implicating the privilege against self-incrimination. *See, e.g, United States v. Holden*, 557 F.3d 698, 706 (6th Cir. 2009). But this situation is different. Although Yenger exercised his right not to testify, the court nevertheless instructed the jurors that they could consider his unsworn statements as a substitute for admissions made in open court. As a result, Yenger was effectively stripped of his right not to testify. I would find submitting the challenged jury instruction constituted reversible error.